T.C. Memo. 1998-349


UNITED STATES TAX COURT


COURTNEY C. HAUN AND REBECCA F. HAUN, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 2930-97.                    Filed October 1, 1998.


<u>R. Cody Mayo, Jr.</u>, for petitioners.

<u>Emile L. Hebert III</u> and <u>Linda J. Bourquin</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

CHIECHI, <u>Judge</u>:  Respondent determined deficiencies in
petitioners' Federal income tax for taxable years 1992 and 1993
in the amounts of $6,233 and $10,353, respectively.

We must decide whether petitioners engaged in their horse
activity during 1992 and 1993 with the objective of making a

profit within the meaning of section 183.[1]   We hold that they did not.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

Petitioners resided in Haughton, Louisiana, at the time they filed the petition.

During the years 1991 through 1996, each petitioner was employed full time by BellSouth.  Petitioner Courtney C. Haun (Mr. Haun) has worked since 1971 as a telephone service technician repairing telephone lines and installing new telephone services.

In March 1991, petitioners purchased approximately 15 acres of real property in Haughton, Louisiana (Haughton property), although they did not reside on that property until about a year after they purchased it.

Prior to moving to the Haughton property, petitioners resided in a trailer house on about two acres of land on which there were a small barn and a pipe lot for the couple of horses that they owned and that Mr. Haun used for, inter alia, roping.

Mr. Haun, a farrier who was trained in blacksmithing around the early 1990's, has been involved with horses since he was around nine years old and has competed with them since he was in

---

[1]  All section references are to the Internal Revenue Code in effect for the years at issue.  All Rule references are to the Tax Court Rules of Practice and Procedure.

junior high school. Throughout his life, Mr. Haun has enjoyed using horses for, inter alia, roping, including team roping, trail riding, and hog hunting and has participated in various recreational activities involving roping horses, including attending roping horse shows, races, and competitions. Mr. Haun's participation in those recreational activities was reduced somewhat after petitioners started training and selling roping horses (roping horse activity) on the Haughton property some time during 1991.

Before petitioners started the roping horse activity in 1991, Mr. Haun consulted with Robert Cook, a lawyer, who advised him to incorporate that activity because of liability concerns. That lawyer referred petitioner to Charles D. Churchill, a certified public accountant, who prepared petitioners' return for 1991.

Sometime prior to the years at issue, Mr. Haun also consulted with Robert Rich, Jr., a professional horse trainer, about the demand for and the difficulty of finding good horses and with another professional horse trainer, Ben Lolly (Mr. Lolly), about the amounts for which horses with which Mr. Lolly was familiar were bought and sold. Mr. Lolly told Mr. Haun about certain team roping sales that had just started and about the United States Team Roping Championships (USTRC). Two people are needed in team roping, a header and a heeler. The header ropes the horns of the cattle, and the heeler ropes its back feet. As of the time of

the trial in March 1998, the USTRC, which was formed around 1990, was the largest recreational team roping organization in the United States, had a classification system that spanned professionals to novices, thereby allowing all ropers to compete at various ability levels, and kept track of the handicap classifications of more than 80,000 ropers in the United States and Canada.  As of March 1998, the USTRC produced and sanctioned more than 90 team ropings annually throughout the United States as well as the USTRC National Finals of Team Roping, which was the largest and richest team roping event in the world.

Team ropers usually buy their roping horses fully trained. Typically, training a horse as a roping horse cannot start until the horse is about six years old.  Generally, a properly trained and mature head roping horse can be sold for more than a properly trained and mature heel roping horse.  Typically, team roping horses are sold (1) by word of mouth at roping horse competitions, such as the USTRC competitions, and (2) at team roping sales that are held in, inter alia, Clovis, New Mexico.  In a brochure prepared for the Clovis Livestock Auction in connection with its 1995 annual spring consignment, which featured its third annual team roping sale in mid-March of that year, Mr. Haun was listed as a consignor for two horses that he transported to that sale.

During relevant periods, petitioner Rebecca F. Haun (Ms. Haun) has from time to time, but not often, helped in the roping

horse activity. It was Mr. Haun who during relevant periods performed virtually all of the tasks relating to the roping horse activity. During the years at issue, he was able to, and did, spend time in that activity only on the weekends and before and after his full-time work at BellSouth during the week. Part of the time on the weekends that Mr. Haun spent during the years at issue in the roping horse activity was recreational.

In July 1991, petitioners began construction on the Haughton property of an arena for training roping horses (roping arena). That arena was completed in September 1991 and has been used by Mr. Haun since that time for training roping horses. Since it was constructed in 1991 through to the date of the trial in this case, the roping arena did not have any bleachers or lights and was not suitable for staging events for either roping horse competitions or roping horse practice sessions. At no time prior to, during, or after the years at issue to the trial date herein did petitioners hire anyone to assist them in the roping horse activity. Petitioners could have held roping horse competitions in the roping arena since it was completed in September 1991 for which entry fees could have been charged if they had added lights, leased or purchased cattle, and hired some help. They also could have held roping horse practice sessions in the roping arena since that time for which entry fees could have been charged without hiring anyone if they had added lights and leased or purchased cattle. Although at some time not disclosed by the

record petitioners had purchased lights and made arrangements to purchase cattle, both of which were needed to hold roping horse competitions and practice sessions, as of the trial date in this case those lights had not been installed in the roping arena, petitioners had not purchased those cattle, and petitioners had not held any roping horse competitions or practice sessions in the roping arena.

In addition to constructing the roping arena in 1991, Mr. Haun's involvement in the roping horse activity during relevant periods included constructing a barn with four stalls, a horse walker, paddocks, and a pipe fence. Since 1991, Mr. Haun has regularly cleaned the horse stalls, fed, watered, blanketed, shoed, wormed, and performed other uncomplicated veterinary procedures for the horses (e.g., vaccinating them), trained them to be roping horses, which takes about two years, rode the roping horses in competitions, and used a tractor in the roping arena.

Prior to 1993, petitioners formed Rafter H, Inc. (Rafter H) and have been its sole shareholders since that time. On January 1, 1995, petitioners transferred all the interests that they had in the roping horse activity, including the horses that they owned, to their wholly owned corporation Rafter H in exchange for additional voting common stock in that corporation, but they did not transfer any of their interests in the Haughton property to Rafter H.

Thereafter, around September 1995, Mr. Haun and Ms. Haun separated. Since their separation, Mr. Haun has been precluded by a court order relating to that separation from selling any community property that he owned with Ms. Haun. As of the time of the trial in this case, Mr. Haun and Ms. Haun were still separated, but they were not divorced.

During 1992, petitioners had at least two horses; during 1993, they had approximately four horses; during 1994, they had between four and six horses; and as of the time of trial herein, they had five or six horses.

Petitioners electronically filed their U.S. individual income tax return (return) for each of the years 1991, 1992, and 1993. Petitioners reported the income, expenses, and loss from the roping horse activity for each of those years in Schedule C of their return for each such year. Petitioners filed a return for 1994 and reported the income, expenses, and loss from the roping horse activity for that year in Schedule F of their 1994 return.

Rafter H filed a U.S. Corporation Income Tax Return (Form 1120) for 1994 and a U.S. Income Tax Return for an S Corporation (Form 1120S) for each of the years 1995 and 1996. The income, expenses, and loss for the roping horse activity for each of the years 1995 and 1996 were reported in the return filed by Rafter H for each of those years. The respective losses of Rafter H from the roping horse activity for 1995 and 1996 were reported as S

corporation losses in Schedules E of petitioners' 1995 and 1996 returns.

Petitioners reported the following amounts of wage income in their returns for 1991 through 1996:

| Year | Wage Income |
|------|-------------|
| 1991 | $71,659 |
| 1992 | 72,345 |
| 1993 | 84,565 |
| 1994 | 84,167 |
| 1995 | 99,366 |
| 1996 | 107,030 |
| Total | 519,132 |

The following income, expenses, and losses from the roping horse activity were reported in petitioners' returns for the years 1991 through 1994 and in Rafter H's returns for the years 1995 and 1996:

| Year | Income | Expenses | Losses |
|------|--------|----------|--------|
| 1991 | -0- | $19,915 | $19,915 |
| 1992 | $600 | 35,108 | 34,508 |
| 1993 | 1,000 | 45,344 | 44,344 |
| 1994 | -0- | 29,712 | 29,712 |
| 1995 | 901 | 26,949 | 26,048 |
| 1996 | -0- | 24,705 | 24,705 |
| Totals | 2,501 | 181,733 | 179,232 |

Respondent determined in the notice of deficiency (notice) that petitioners are not entitled to the expenses with respect to the roping horse activity in the amounts of $35,108 and $45,344 that they claimed in Schedules C of their 1992 and 1993 returns, respectively.[2]

---

[2] The parties stipulated that if the Court were to determine that petitioners engaged in the roping horse activity
(continued...)

OPINION

Petitioners bear the burden of proving that respondent's determinations in the notice are erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

Section 183(a) generally limits the amount of expenses that a taxpayer may deduct with respect to an activity "not engaged in for profit" to the deductions provided in section 183(b). Section 183(b)(1) provides that deductions which would be allowable without regard to whether such activity is engaged in for profit are to be allowed. Section 183(b)(2) further provides that deductions which would be allowable only if such activity were engaged in for profit are to be allowed, but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable under section 183(b)(1). An activity is "not engaged in for profit" if it is an activity other than one with respect to which deductions are allowable for the taxable year under section 162 or section 212(1) or (2). Sec. 183(c).

In determining whether an activity is engaged in for profit, the taxpayer must show that he or she engaged in the activity with an actual and honest objective of making a profit. E.g.,

---

[2](...continued)
during 1992 and 1993 with the objective of making a profit within the meaning of sec. 183, they would be entitled for those years to losses from that activity in the respective amounts of $26,487 and $41,486.

Hulter v. Commissioner, 91 T.C. 371, 392 (1988); Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983).  Although the taxpayer's expectation of a profit need not be reasonable, he or she must have a good faith objective of making a profit.  E.g., Dreicer v. Commissioner, supra at 645; Dunn v. Commissioner, 70 T.C. 715, 720 (1978), affd. on another issue 615 F.2d 578 (2d Cir. 1980); sec. 1.183-2(a), Income Tax Regs.  Petitioners bear the burden of proving the requisite intent.  E.g., Golanty v. Commissioner, 72 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981); Johnson v. Commissioner, 59 T.C. 791, 813 (1973), affd. 495 F.2d 1079 (6th Cir. 1974).  Whether a taxpayer is engaged in an activity with the requisite profit objective is determined from all the facts and circumstances.  E.g., Hulter v. Commissioner, supra at 393; Taube v. Commissioner, 88 T.C. 464, 480 (1987); Golanty v. Commissioner, supra at 426; sec. 1.183-2(a) and (b), Income tax Regs.  More weight is given to objective facts than to the taxpayer's mere statement of his or her intent.  E.g., Dreicer v. Commissioner, supra at 645; sec. 1.183-2(a), Income Tax Regs.

The regulations promulgated under section 183 list the following nine factors that should normally be taken into account in determining whether an activity is engaged in for profit: (1) The manner in which the taxpayer carried on the activity,

(2) the expertise of the taxpayer or his advisers, (3) the time and effort expended by the taxpayer in carrying on the activity, (4) the expectation that assets used in the activity may appreciate in value, (5) the success of the taxpayer in carrying on other similar or dissimilar activities, (6) the taxpayer's history of income or loss with respect to the activity, (7) the amount of occasional profits, if any, which are earned, (8) the financial status of the taxpayer, and (9) the extent to which elements of personal pleasure or recreation are involved. Sec. 1.183-2(b), Income Tax Regs. The list of factors in the regulations is not exclusive, and other factors may be considered in determining whether an activity is engaged in for profit. No single factor is dispositive. E.g., Golanty v. Commissioner, supra at 426; sec. 1.183-2(b), Income Tax Regs. The determination of a profit objective does not depend on counting the number of factors that support each party's position. E.g., Dunn v. Commissioner, supra at 720; sec. 1.183-2(b), Income Tax Regs.

Petitioners contend that during 1992 and 1993 they were engaged in the roping horse activity for profit within the meaning of section 183. Respondent disagrees. On the record before us, we sustain respondent's position.

Mr. Haun has owned horses and competed with them since he was a child. Since then, he has enjoyed using horses for, inter alia, roping, trail riding, and hog hunting and has participated in various recreational activities involving roping horses,

including attending roping horse shows, races, and competitions.
Sometime during 1991, petitioners started the roping horse
activity on the Haughton property, which reduced somewhat Mr.
Haun's participation in those recreational activities. However,
petitioners have failed to establish that during the years at
issue (or at any other time) they projected the future income,
expenses, or profits that they expected to be generated by the
roping horse activity. Although during the years at issue
petitioners apparently retained adequate records relating to the
expenses that they incurred in the roping horse activity so as to
enable them and respondent to stipulate to the amount of loss for
each such year to which they would be entitled in the event that
the Court were to find that they engaged in that activity with an
objective of making a profit within the meaning of section 183,[3]
they have not established that they had a business plan for
generating a profit from the roping horse activity.

Prior to the years at issue, Mr. Haun consulted a lawyer who
advised him to incorporate the roping horse activity, which
petitioners did prior to 1993. Mr. Haun also consulted a certi-
fied public accountant, who prepared petitioners' 1991 return,
and two professional horse trainers who discussed with Mr. Haun
the demand for and the difficulty of finding good horses, the
prices at which certain horses were bought and sold, certain team

---

[3] See _supra_ note 2.

roping sales that had just started, and the USTRC.  However, there is nothing in the record establishing that the individuals to whom Mr. Haun spoke prior to the years at issue had discussions with, or made any recommendations to, petitioners with respect to making the roping horse activity profitable or that petitioners accepted any such recommendations that they might have made.  In this connection, petitioners did not call as witnesses any of the individuals to whom Mr. Haun spoke prior to the years at issue.  We presume that they did not call them as witnesses because their testimony would have been unfavorable to petitioners' position in this case.  <u>Wichita Terminal Elevator Co. v. Commissioner</u>, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947).

Nor have petitioners shown that they changed the operation of the roping horse activity during or after the years at issue in order to generate a profit or that they hired any individual with the expertise and experience necessary to make that activity profitable.  In fact, since the roping arena was constructed by Mr. Haun in 1991 through to the date of the trial in this case, that arena did not have any bleachers or lights and was not suitable for staging events for either roping horse competitions or roping horse practice sessions.  Petitioners could have held roping horse competitions in the roping arena since it was completed in September 1991 for which entry fees could have been charged if they had added lights, leased or purchased cattle, and

hired some help.  They also could have held roping horse practice sessions in that arena since that time for which entry fees could have been charged without hiring anyone if they had added lights and leased or purchased cattle.  Although at some time not disclosed by the record petitioners had purchased lights and made arrangements to purchase cattle, both of which were needed to hold roping horse competitions and practice sessions, as of the trial date in this case those lights had not been installed in the roping arena, and petitioners had not purchased those cattle, hired anyone to assist them, or held any roping horse competitions or practice sessions in the roping arena.

Although during and after the years at issue Mr. Haun performed virtually all of the tasks relating to the roping horse activity, he was able to, and did, spend time in that activity only on the weekends and before and after his full-time work at BellSouth during the week.  Part of the time on the weekends that Mr. Haun spent during the years at issue in the roping horse activity was recreational.  We find the nature of the tasks and the amount of time that Mr. Haun spent in the roping horse activity during and after the years at issue to be consistent with his lifetime enjoyment of horses.

Petitioners had sufficient income during the years at issue,[4] notwithstanding the losses from the roping horse activity

---

[4] Petitioners reported the following amounts of wage income
(continued...)

which they attempted to use to reduce their tax liability for those years.[5]

Petitioners contend that they expected the Haughton property and all of the horses, equipment, saddles, pipe, and tack to appreciate in value. Turning first to the Haughton property, petitioners claim on brief that they paid $60,000 for that property, although the record establishes only that they offered to buy that property for $60,000. According to Mr Haun's testimony, the fair market value of the Haughton property at the time of trial in March 1998 was approximately $150,000. On the

---

[4](...continued)
in their returns for 1991 through 1996:

| Year | Wage Income |
|------|-------------|
| 1991 | $71,659 |
| 1992 | 72,345 |
| 1993 | 84,565 |
| 1994 | 84,167 |
| 1995 | 99,366 |
| 1996 | 107,030 |
| Total | 519,132 |

[5] The following income, expenses, and losses from the roping horse activity were reported in petitioners' returns for the years 1991 through 1994 and in Rafter H's returns for the years 1995 and 1996:

| Year | Income | Expenses | Losses |
|------|--------|----------|--------|
| 1991 | -0- | $19,915 | $19,915 |
| 1992 | $600 | 35,108 | 34,508 |
| 1993 | 1,000 | 45,344 | 44,344 |
| 1994 | -0- | 29,712 | 29,712 |
| 1995 | 901 | 26,949 | 26,048 |
| 1996 | -0- | 24,705 | 24,705 |
| Totals | 2,501 | 181,733 | 179,232 |

instant record, we are not satisfied that petitioners paid $60,000 to acquire that property. Nor are we persuaded by Mr. Haun's uncorroborated testimony that the fair market value of the Haughton property at the time of the trial in this case was approximately $150,000.[6]

With respect to the horses, equipment, saddles, pipe, and tack used in the roping horse activity, at trial Mr Haun estimated that those assets could be sold for an aggregate maximum amount of approximately $104,000. We are not persuaded by Mr. Haun's uncorroborated testimony that, as of the date of the trial in this case, such an amount could have been received upon the sale of those assets. Indeed, Mr. Haun's testimony about the aggregate amount that he believed could have been received as of that date from the sale of the five or six[7] roping horses used in

---

[6] Furthermore, we are not satisfied on the instant record that the roping horse activity and the holding of the Haughton property are to be considered one activity for purposes of sec. 183. The deductions attributable to the roping horse activity over the period 1991 through 1996 that are not directly attributable to the holding of the Haughton property far exceeded the income (only $2,501) over that period that was derived from that activity. See sec. 1.183-1(d)(1), Income Tax Regs. In addition, it is significant that on Jan. 1, 1995, petitioners transferred all the interests that they had in the roping horse activity to their wholly owned corporation Rafter H in exchange for additional voting common stock in that corporation. However, they did not transfer to that corporation at that time (or any other time) any of their interests in the Haughton property.

[7] Mr. Haun's testimony about the number of horses used in the roping horse activity during 1992, 1993, and 1994 and as of the trial herein was vague and/or contradictory. If petitioners had an actual and honest objective of making a profit from the

(continued...)

the roping horse activity (viz. between $65,000 and $70,000) is belied by evidence in the record showing that the most that was received over the period 1991 through 1996 from the sale of a roping horse was $1,000 during 1993.

On the record before us, we find that petitioners have failed to establish that they intended in good faith that any expected appreciation in the value of the assets used in the roping horse activity, when realized, would, together with any income from that activity, exceed the expenses therefrom.

We have considered and reject all of petitioners' other claims and contentions with respect to the roping horse activity.

Based on our review of the entire record before us, we find that petitioners have failed to prove that during the years at issue the roping horse activity was an activity engaged in for profit within the meaning of section 183. Accordingly, we sustain respondent's determinations.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent</u>.

---

[7](...continued) roping horse activity, we would have expected Mr. Haun's recollection about the number of horses used in that activity to be clear and specific.